**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON**

**CRIMINAL ACTION NO. 24-14-DLB-CJS-1**

**UNITED STATES OF AMERICA**                                                       **PLAINTIFF**

**VS.**                     **MEMORANDUM OPINION AND ORDER**

**BIN LIU**                                                                            **DEFENDANT**

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

This matter is before the Court upon Defendant Bin Liu's Motion to Suppress Evidence and Statements. (Doc. # 44). After the United States filed its Response (Doc. # 48) and Defendant did not file a reply, the Court conducted an evidentiary hearing on the Motion on November 15, 2024. (Doc. # 61). Defendant was present for the hearing and was represented by Attorney Stefanie Durstock. Defendant was also assisted by Mandarin Chinese interpreter Mae Harman. The United States was represented by Assistant United States Attorney Kyle M. Winslow. At the conclusion of the hearing, the Court took the Motion under submission. For the following reasons, Defendant's Motion is **denied**.

**I.**     **ISSUES RAISED**

Defendant moves the Court to suppress evidence seized and statements he made to law enforcement officials on November 14, 2022. (Doc. # 44 at 1). The evidence was seized after Defendant allegedly consented to warrantless searches of his person and belongings, and the statements concerned Defendant's involvement in the trafficking of drugs and drug proceeds. (*Id.* at 1-2; Doc. # 48 at 1-4). In his Motion, Defendant argues

1

that the evidence and statements should be suppressed because, respectively: (1) he did not voluntarily consent to the searches and (2) he was not apprised of his right against self-incrimination despite being subject to custodial interrogation.  (Doc. # 44 at 2-4).  In its Response, the United States argues to the contrary that: (1) Defendant voluntarily consented to the searches and (2) Defendant was not in custody when he made the statements.  (Doc. # 48 at 4-7).

II.     **FINDINGS OF FACT**

During the evidentiary hearing held on November 15, 2024, the Court heard testimony from two witnesses called by the United States: (1) Douglas Kopp, an officer with the Airport Police Department and a task force officer with the Drug Enforcement Administration ("DEA"); and (2) Christopher Boyd, a task force officer with the DEA. Although Defendant did not call any witnesses, he did testify on his own behalf.  Weighing the credibility of the witnesses, and considering the exhibits admitted during the hearing, the Court makes the following factual findings.

On November 14, 2022, Defendant arrived at the Cincinnati/Northern Kentucky International Airport ("CVG") for a return flight to Los Angeles with a layover in Denver. After going through the airport's main TSA security checkpoint, Defendant's belongings were found to contain large amounts of cash.  Officer Kopp, who was assigned to CVG, was notified about the situation and returned to the airport to assist with the investigation of Defendant.[1]  Before returning to CVG, Officer Kopp called Officer Boyd, who was also assigned to CVG, to inform him about Defendant and to request Officer Boyd's assistance.

---

[1]     Officer Kopp had already "left the airport for the day" when he was informed about Defendant.

Officer Kopp arrived at CVG at approximately 8:00 p.m. There, he discovered Defendant along with certain TSA agents in a secondary screening room on the "secured" side of the main security checkpoint. After confirming that the TSA agents had completed their investigation of Defendant, Officer Kopp encountered Defendant just outside the secondary screening room near the main security checkpoint. Officer Kopp then introduced himself to Defendant, and asked Defendant if he would answer some questions. Defendant agreed to do so. Their conversation was entirely in English.

According to his testimony, Officer Kopp informed Defendant that he was free to leave early on in their conversation as well as several times throughout it. After Officer Kopp asked Defendant if he wanted to speak at a more private location, Defendant initially agreed. But as Officer Kopp started to lead him there, Defendant stated that he wanted to stay where he was. Shortly thereafter, Officer Boyd arrived at the location and made contact with Officer Kopp and Defendant.

Officer Kopp first asked Defendant how much cash he had on him. In response, Defendant stated that he was carrying $100,000 in cash. When asked why he was carrying so much cash, Defendant stated that he had flown into CVG earlier that day with $25,000 in cash and had met with an individual named "Buck" who owed Defendant $50,000. When asked where the remaining $25,000 had come from, Defendant stated that it was given to him by an individual named "Burge" who owed Defendant that amount for poker lessons. Defendant further stated that Buck had picked up Defendant from the airport and drove him to a restaurant where Buck gave Defendant a gift bag containing $50,000 in cash. When questioned, Defendant could not remember the name of the restaurant. When asked about his employment, Defendant stated that he was a

3

professional gambler who also "did some consulting work" but that had not earned any income from these activities in the previous year and a half.

Officer Kopp also asked Defendant about his travel itinerary and prior encounters with police. Defendant confirmed that he was returning on a round-trip flight from Los Angeles to CVG, and that he had arrived at CVG approximately six hours earlier that day. When asked if he had ever been arrested, Defendant stated that he was arrested in California earlier that year. This occurred after Defendant was discovered with 50 pounds of marijuana and $70,000 in cash.

Officer Kopp then asked Defendant for permission to search his belongings—specifically, his backpack, carry-on suitcase, and gift bag. Defendant consented to the searches. Officer Kopp discovered bulk currency in all three items. Officer Kopp testified that the currency appeared to be much more than the $100,000 Defendant had previously admitted to possessing. When Officer Kopp asked him how much cash he actually had, Defendant did not respond. Officer Kopp then asked Defendant whether the cash was drug proceeds. Defendant admitted that it was. Defendant further admitted that he would ship marijuana to individuals at various locations and then fly to those locations to collect payment for the marijuana.

Officer Boyd then asked Defendant for permission to search his cell phone.[2] In response, Defendant asked Officer Boyd whether the officers were going to seize the cell phone. Officer Boyd responded that the officers would not seize the cell phone if Defendant allowed them to search it. Defendant then nodded in agreement, unlocked the phone by entering his passcode, and handed it to Officer Boyd. On the phone, Officer

---

[2]  Defendant actually possessed two cell phones. However, one of them was "dead" and the officers were unable to charge it.

4

Boyd discovered hundreds of messages and photographs allegedly indicative of drug trafficking. Officer Boyd memorialized this evidence by taking pictures of it with his own cell phone. He then returned Defendant's cell phone to Defendant. Officer Boyd then asked permission to search Defendant's person, and Defendant consented. Upon searching Defendant's person, Officer Boyd discovered bulk currency in Defendant's jacket and pants pockets. In total, Defendant possessed $313,775 in cash.

The officers' entire encounter with the Defendant lasted approximately 45 minutes. The entire conversation with Defendant was in English, Officer Kopp never had any difficulty communicating with Defendant, Defendant never requested an interpreter, and Defendant never had any issues understanding or comprehending Officer Kopp's questions. During their conversations with Defendant, both officers wore plainclothes, did not display any weapons, did not raise their voices, did not threaten Defendant, and did not handcuff or otherwise restrain Defendant.

Defendant was born in China but moved to the United States in 1990 when he was 28 years old. Defendant first moved to the United States to attend a part-time graduate school program in computer science at the University of Nevada, Reno. He completed two to three years of that program. Defendant was 61 years old when he encountered the officers at CVG.

Defendant acknowledged that he consented to the searches of his person and belongings, but stated he believed at the time that he could not refuse consent and that he was not free to leave. Defendant testified that had he known he could have refused consent, he would have done so. Defendant's beliefs were informed by his upbringing and early adulthood in China where, according to him, one has "to cooperate with the

5

police and answer any questions they ask[;]" one cannot refuse consent to a search; and if one encounters the police, one cannot leave unless the police give one permission to do so. Defendant acknowledged that in April 2022, he was arrested for possession of marijuana, and that the arresting officers advised him of his right to remain silent upon his arrest. Defendant also acknowledged that neither Officer Kopp nor Officer Boyd ever told him that he must cooperate or that he had to answer their questions. Defendant described the officers as "very nice" and stated that his conversations with them were "very casual and very courteous."

### III.  ANALYSIS

Defendant argues that the searches of his person and belongings violated the Fourth Amendment and that his statements were obtained in violation of his Fifth Amendment right against self-incrimination. (Doc. # 44). The Court disagrees, and addresses each of these issues in turn.

**A.  Defendant voluntarily consented to the searches of his person and belongings.**

The Fourth Amendment provides, in pertinent part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" U.S. Const. amend. IV. Generally, if a search or seizure is not conducted in compliance with the Fourth Amendment, all evidence obtained because of the search or seizure must be suppressed. *See United States v. Gross*, 550 F.3d 578, 583 (6th Cir. 2008) ("[E]vidence and statements obtained from [an] illegality must be excluded as 'fruit of the poisonous tree.'") (citing *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)). Warrantless searches are per se unreasonable "except in a few specifically established and well-delineated exceptions." *United States v. Lewis*, 504 F.2d

6

92, 100 (6th Cir. 1974) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)) (internal quotation marks omitted). The burden is on the United States to demonstrate the applicability of an exception to the warrant requirement. *United States v. McClain*, 444 F.3d 556, 562 (6th Cir. 2005).

Here, it is undisputed that the challenged searches of Defendant's person and belongings were not authorized by a warrant. Therefore, to pass constitutional muster, the United States must establish that one of the specifically established exceptions to the warrant requirement applied. *Katz*, 389 U.S. at 357.

"Consent is an exception to the Fourth Amendment's warrant requirement." *United States v. Lewis*, 81 F.4th 640, 651 (6th Cir. 2023) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)). That said, "consent must be 'voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress or coercion.'" *United States v. Bowser*, 505 F. App'x 522, 525 (6th Cir. 2012) (quoting *United States v. Lucas*, 640 F.3d 168, 174 (6th Cir. 2011). Whether consent was voluntary turns on "the totality of the circumstances, including the individual's age, intelligence and education; whether the individual understands his right to refuse consent and his constitutional rights; the length and nature of the detention and whether the police used any coercive or punishing conduct, including subtle forms of coercion that might flaw an individual's judgment." *United States v. Collins*, 683 F.3d 697, 702 (6th Cir. 2012) (quoting *United States v. Salvo*, 133 F.3d 943, 953 (6th Cir. 1998)) (internal quotation marks omitted). Moreover, "[w]hether consent to search is voluntary is a question of fact[,]" and "a district court's finding of voluntary consent will not be reversed unless it is clearly erroneous." *Id.* (internal citations omitted).

7

Here, the first and third factors unambiguously support a finding that Defendant voluntarily consented to the searches. As to the first factor, Defendant was 61 years old when he encountered the officers at CVG, had completed some graduate level study of computer science, and was able to intelligently answer questions posed to him by the officers at CVG and by counsel and the Court at the evidentiary hearing. Regarding the third factor, Defendant's encounter with the officers lasted approximately 45 minutes, making the interview relatively short compared to at least one other case within this circuit. *See United States v. Blevins*, No. 3:18-cr-00022-TAV-HBG, 2019 WL 5866142, at *11 (E.D. Tenn. July 30, 2019), *report and recommendation adopted by* 2019 WL 5865925 (E.D. Tenn. Nov. 8, 2019) (police interview lasting "a couple of hours" was not coercive). Moreover, there is no indication that the officers utilized any coercive tactics in obtaining Defendant's consent. To the contrary, both officers wore plainclothes, did not display any weapons, did not raise their voices, did not threaten Defendant, and did not handcuff or otherwise retrain Defendant. Moreover, Defendant himself described the officers as "very nice" and stated that his conversation with them was "very casual and very courteous."

Assessment of the second factor is more ambiguous. Defendant testified that although he consented to the searches, he believed at the time that he could not refuse consent, that he must answer the officers' questions, and that he was not free to leave. Defendant testified that these beliefs were informed by his upbringing and early adulthood in China. If Defendant's statements are to be credited, then he did not actually know that he could refuse consent.

As a preliminary matter, however, the Court is not convinced that Defendant did not know that he could refuse consent—or about his constitutional rights more generally—

8

for three separate reasons. First, Defendant moved to the United States in 1990 at the age of the 28 and has spent most of his adult life living in the United States. Given the length of his residency in the United States, the Court does not see how Defendant could have been completely ignorant of his constitutional rights before encountering the officers at CVG. Second, Defendant himself picked the location where he would speak to the officers and only consented to the search of his cell phone after confirming that it would be returned to him. That Defendant seemingly felt empowered to limit where the conversation took place and the scope of the search of his cell phone suggests that he knew he could refuse consent. And third, Defendant was admittedly informed of his right to remain silent after he was arrested in April 2022, or approximately seven months prior to the events at issue. Defendant's admitted knowledge of his right to remain silent belies his stated understanding that he must always comply with whatever the police ask of him.

But even if Defendant did not actually know that he could refuse consent, this still would not establish that his consent was involuntary. As this Court has noted, "[c]onsent can still be voluntary without knowledge of one's right to refuse." *United States v. Slone*, No. 7:12-cr-00005, 2013 WL 3799419, at *7 (E.D. Ky. July 19, 2013) (Thapar, J.) (citing *Schneckloth*, 412 U.S. at 227); *Collins*, 683 F.3d at 702 (although knowledge of one's right to "refuse consent to search is a factor to consider in determining whether consent was voluntary, police do not have to inform an individual of his right to refuse to consent to a search."). Indeed, "[a] subjective belief of coercion is not sufficient to destroy voluntariness." *United States v. McCauley*, 548 F.3d 440, 446 (6th Cir. 2008).

For these reasons, and given the totality of the circumstances, the Court concludes that Defendant voluntarily consented to the searches of his person and belongings. The

9

Court accordingly concludes that the evidence seized because of the searches was not obtained in violation of the Fourth Amendment. And in the absence of any other reason to do so, the Court will not suppress such evidence.

> **B.    The statements at issue were not obtained in violation of the Fifth Amendment.**

The Fifth Amendment provides, in pertinent part, that "[n]o person shall . . . be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V. "In *Miranda v. Arizona*, the Supreme Court held that, in order to protect against compulsory self-incrimination, a suspect may not be subject to custodial interrogation until he has been informed of his right to counsel and his right to remain silent." *Koras v. Robinson*, 123 F. App'x 207, 210 (6th Cir. 2005) (citing 384 U.S. 436, 479 (1966)). "Statements made by a defendant in response to interrogation while in police custody are not admissible unless the defendant has been [apprised] of the constitutional right against self-incrimination and has validly waived this right." *United States v. Cole*, 315 F.3d 633, 636 (6th Cir. 2003) (citing *Miranda*, 384 U.S. at 478-79). In other words, "[t]he requirements of *Miranda* arise when a defendant is both: (1) in custody; and (2) being interrogated." *United States v. Hinds*, Case No. 18-20533, 2019 WL 7172090, at *2 (E.D. Mich. Dec. 23, 2019) (citing *United States v. Swanson*, 341 F.3d 524, 528 (6th Cir. 2003)).

It is undisputed that Defendant was not *Mirandized* before he spoke to law enforcement. It is also undisputed that Defendant was being interrogated when he made the statements. Thus, the sole issue is whether Defendant was in custody when he spoke to the officers. For the following reasons, the Court concludes that he was not.

"For purposes of *Miranda*, a person is in custody when, under the circumstances surrounding the interrogation, the person was under formal arrest or experienced restraint

10

on freedom of movement of the degree associated with a formal arrest." *United States v. Landor*, 699 F. Supp. 2d 913, 919 (E.D. Ky. 2009) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)) (internal quotation marks and bracketing omitted). Courts consider several factors to determine whether an interrogation was custodial, "including (1) the location of the interview; (2) the length and manner of the questioning; (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told that he or she did not need to answer the questions." *United States v. Hinojosa*, 606 F.3d 875, 883 (6th Cir. 2010). Here, each of the factors counsel against a finding that Defendant was in custody.

As to the first factor, Defendant was questioned near the "secured" side of CVG's main security checkpoint. During his testimony, Officer Kopp stated that although the security line closest to him and Defendant was closed, passengers were still coming through security who walked by their location while proceeding through the checkpoint to catch their flights. Where a defendant was questioned "in an airport terminal, a public area, and surrounded by other people," the Sixth Circuit has determined that the "place of questioning" weighed against defining the defendant's detention as custodial. *United States v. Martin*, 95 F. App'x 169, 177 (6th Cir. 2004). As to the second factor, the length of the encounter at issue (*i.e.*, approximately 45 minutes) is in line with the window of time courts generally consider to be non-custodial, *see United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999) (interview lasting "only an hour and a half" was non-custodial), and the manner of questioning was not coercive for the reasons already stated above. Regarding the third and fourth factors, there was no restraint on Defendant's freedom of movement, and he was told that he was free to go.

For these reasons, the Court concludes that Defendant was not in custody when he made the statements at issue, and therefore, *Miranda* warnings were not necessary. The Court accordingly concludes that the statements at issue were not obtained in violation of the Defendant's Fifth Amendment rights. And in the absence of any other reason to do so, the Court will not suppress such statements.

IV. **CONCLUSION**

Based on the record, the arguments presented, and the authorities cited, the Court concludes that the evidence and statements at issue were not obtained in violation of the Defendant's Fourth or Fifth Amendments. Accordingly,

**IT IS ORDERED** that Defendant Bin Liu's Motion to Suppress Evidence and Statements (Doc. # 44) is **DENIED**.

This 22nd day of November, 2024.

Signed By:
*David L. Bunning* DB
United States District Judge

G:\Judge-DLB\DATA\ORDERS\Covington Criminal\2024\24-14-1 MOO re MTS.docx